UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JAN -9 PM 3: 16

CLERK

BY_____
DEPUTY CLERK

DAVID GALUSZKA,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )        Case No. 2:15-cv-241
                                   )
RELIANCE STANDARD LIFE             )
INSURANCE COMPANY,                 )
                                   )
          Defendant.               )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO
SUPPLEMENT THE ADMINISTRATIVE RECORD, GRANTING PLAINTIFF'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD,
DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD, AND DEFERRING ADJUDICATION OF
DEFENDANT'S COUNTERCLAIM**
(Docs. 20, 22 & 24)

In this lawsuit, Plaintiff David Galuszka seeks an award of continued and past due

disability benefits from Defendant Reliance Standard Life Insurance Company

("Reliance") pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001-1461.  Based upon the administrative record ("AR")

before the court, Mr. Galuszka requests a determination that he is "totally disabled"

within the meaning of Reliance's group long term disability ("LTD") insurance policy

LTD120310 ("the Policy") issued to his former employer Northwestern Medical Center,

Inc. ("NMC").  On July 8, 2016, the parties filed cross motions for judgment on the AR

(Docs. 22 & 24).

On July 6, 2016, Mr. Galuszka moved to supplement the AR to include four

documents (Doc. 20).  Reliance agreed that the AR may be supplemented with two of

these documents: a July 21, 2014 letter from Mr. Galuszka's counsel to Reliance

appealing the denial of coverage under group term life insurance and supplemental group

term life insurance policies GL146604 and GL146608 (the "Life Insurance Policies") (Doc. 20-1); and Reliance's August 25, 2014 letter to Mr. Galuszka's counsel regarding its denial of coverage under the Life Insurance Policies (Doc. 20-2).

Reliance opposes Mr. Galuszka's request to supplement the AR with two additional documents: a January 17, 2014 letter from his Social Security Disability Insurance ("SSDI") claim representative, Allsup, Inc. ("Allsup"), to the Social Security Administration ("SSA") (the "Allsup letter") (Doc. 20-3); and the SSA's March 17, 2014 fully favorable decision awarding Mr. Galuszka SSDI benefits based on a finding that he is disabled within the meaning of the Social Security Act (the "SSDI Decision") (Doc. 20-4).

On July 12, 2016, the court granted Mr. Galuszka's motion to supplement the AR to the extent it was unopposed and deferred ruling on the remainder. After oral argument on October 24, 2016, the court took the pending motions under advisement.

Mr. Galuszka is represented by Arthur P. Anderson, Esq. Reliance is represented by Andrew S. Davis, Esq. and Byrne J. Decker, Esq.

## I.    The Policy.

The Policy states that Reliance will pay monthly benefits under the Policy if the insured:

(1)    is Totally Disabled as the result of a Sickness or Injury covered by this Policy;

(2)    is under the regular care of a Physician;

(3)    has completed the Elimination Period; and

(4)    submits satisfactory proof of Total Disability to [Reliance].

(AR 18.)

The Policy defines "Total Disability" and "Totally Disabled" to mean that "as a result of an Injury or Sickness:"

(1)    during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation; . . . and

2

(2)     after a Monthly Benefit has been paid for 24 months, an Insured
        cannot perform the material duties of any occupation. Any
        occupation is one that the Insured's education, training or experience
        will reasonably allow. We consider the Insured Totally Disabled if
        due to an Injury or Sickness he or she is capable of only performing
        the material duties on a part-time basis or part of the material duties
        on a [f]ull-time basis.

(AR 10.)

The Policy provides that, at its expense, Reliance has the right to have a claimant
"interviewed and/or examined . . . physically[,] psychologically[,] and/or psychiatrically"
"to determine the existence of any Total Disability which is the basis for a claim" and
"[t]his right may be used as often as it is reasonably required while a claim is pending[.]"
(AR 14.)

The Policy calculates an Insured's benefit by determining a percentage of the
Insured's monthly earnings using a schedule of benefits and subtracting "Other Income
Benefits" "resulting from the same Total Disability" which includes "disability or
Retirement Benefits under the United States Social Security Act[.]" (AR 18.) The Policy
states that "[i]f we have overpaid the Monthly benefit for any reason, the overpayment
must be repaid to us." (AR 19.)

**II.     Whether to Supplement the Administrative Record.**

The court "may expand its review of an administrative decision beyond the record
in front of the claims administrator upon finding 'good cause' warranting the introduction
of additional evidence." *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 97 (2d Cir. 2003) (citing
*Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 646 (2d Cir. 2002)); *see also DeFelice v. Am.
Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66 (2d Cir. 1997) ("[T]he decision whether
to admit additional evidence is one which is discretionary with the district court, but
which discretion ought not to be exercised in the absence of good cause."). "A
demonstrated conflict of interest in the administrative reviewing body is an example of
'good cause' warranting the introduction of additional evidence." *Id.* at 67. An
administrator's conflict of interest, however, "does not constitute *per se* good cause" to

3

allow additional evidence in a *de novo* review. *Locher v. Unum Life Ins. Co. of Am.*, 389
F.3d 288, 294 (2d Cir. 2004).

Mr. Galuszka argues that "good cause" exists to supplement the AR because
Reliance's claim decision was tainted by a conflict of interest. He contends that Reliance
arranged for Allsup to represent him in his application for SSDI benefits. At the same
time, he asserts Allsup allegedly represented Reliance in the recovery of any
overpayment of benefits under Policy.[1] Reliance paid Allsup for its services on Mr.
Galuszka's behalf. In turn, Allsup waived any fee from Mr. Galuszka in the event he was
awarded past due benefits pursuant to the Social Security Act.

Mr. Galuszka further notes that the Allsup letter contains factual representations
regarding the extent of his disability and his ability to work that are inconsistent with
Reliance's determination that he is not "totally disabled" under the Policy.[2] Mr.

---

[1] As Reliance points out, Allsup is not a party to October 25, 2012 Reimbursement Agreement
wherein Reliance agreed to "defer its rights to deduct an estimate of . . . S[ocial] S[ecurity] . . .
benefits from" Mr. Galuszka's benefits under the Policy in exchange for his agreement to file an
application for SSDI benefits, to send any letters he received from the SSA as soon as he
received them to the Claims Department at Reliance, and to "reimburse [Reliance] for the full
amount which may be overpaid to [him] in the event [he was] awarded . . . S[ocial] S[ecurity]
benefits, including retroactive awards[.]" (AR 577.)

[2] In its letter, Allsup represented that Mr. Galuszka could not work full-time even at a sedentary
level of exertion. This representation presumably assisted Mr. Galuszka in obtaining SSDI
benefits that would then be recoverable by Reliance to the extent there was an overpayment of
benefits under the Policy. Reliance therefore stood to benefit from Allsup's representations on
Mr. Galuszka's behalf. When Reliance denied Mr. Galuszka benefits under the Policy based on
its finding that he retained the ability to work full-time, it also stood to benefit from that
decision. Courts have found similar facts constitute a conflict of interest. *See, e.g.*, *Mikrut v.
UNUM Life Ins. Co. of Am.*, 2006 WL 3791417, at \*9 (D. Conn. Dec. 21, 2006) ("Although the
findings of the SSA are not binding on [the insurer,] its treatment of that evidence, namely using
it to demand a return of funds but failing to factor it in its analysis of [plaintiff's] claim, reveals
that [the insurer's] decision was actually affected by its conflict of interest."). In *Ladd v. ITT
Corp.*, 148 F.3d 753 (7th Cir. 1998), Judge Posner explained why such conduct is concerning:

> [T]he defendants encouraged and supported [plaintiff's] effort to demonstrate
> total disability to the Social Security Administration, going so far as to provide
> her with legal representation. To further lighten that cost, it then turned around
> and denied that [plaintiff] was totally disabled, even though her condition had
> meanwhile deteriorated. In effect, having won once the defendants repudiated the

4

Galuszka contends that Allsup's coterminous representation of him and Reliance, and its conflicting factual representations, create a conflict of interest that supports a finding of "good cause."

Mr. Galuszka argues that "good cause" exists for the further reason that he had a reasonable, albeit mistaken, belief that the Allsup letter and the SSDI Decision were included in the AR.[3] He faults Reliance for not asking Allsup to supply it with those documents upon Reliance's receipt of Allsup's March 25, 2014 notification that it had obtained the fully favorable SSDI Decision on his behalf. He claims that he was unaware that these documents were missing from the AR until his present counsel obtained the SSA file in preparation for this lawsuit.

Reliance counters that it was Mr. Galuszka's burden to ensure that the AR was complete and that his neglect and delay in doing so precludes a finding of "good cause." While not challenging Mr. Galuszka's contention that Reliance paid Allsup to represent him before the SSA, Reliance asserts that Mr. Galuszka "cites no record evidence to support the notion that Reliance somehow controls Allsup and in fact Allsup is not related to Reliance." (Doc. 21 at 2.) With regard to whether the Allsup letter and the SSDI Decision should be included in the AR, Reliance contends that "[c]ontrary to [Mr. Galuszka's] argument, Reliance did consider the award of Social Security benefits" (Doc. 21 at 3) in its denial of benefits under the Policy. *See* Doc. 32 at 4 ("After Reliance notified [Plaintiff of its decision to discontinue benefits], the Social Security Administration awarded disability benefits to Plaintiff retroactively. Reliance considered the award as well as other evidence when it again considered Plaintiff's eligibility for benefits on appeal."). Reliance nonetheless asks the court to exclude the Allsup letter and

basis of their first victory in order to win a second victory. This sequence casts additional doubt on the adequacy of their evaluation of [plaintiff's] claim[.]

*Id.* at 756.

[3] Mr. Galuszka contends that he properly relied on his former counsel, Paul Morwood, Esq., to provide the documents to Reliance while its claim review was pending. He states that Attorney Morwood "submitted a disc of Mr. Galuszka's Social Security record (AR 970), [but] the ALJ's decision was either not on that disc or Reliance Standard did not include it in the record." (Doc. 25 at 5.)

the SSDI Decision from the AR because those documents reflect a different standard for a "disability" than the Policy, and are based on a different administrative record.

In determining "good cause," the court considers whether Mr. Galuszka's neglect was excusable, whether he timely sought supplementation of the AR, whether supplementation of the AR is unfairly prejudicial to Reliance, and whether the documents sought to be included are material to the court's determination or are merely collateral to the issues before the court or cumulative of information already in the AR. The court also considers whether there is a conflict of interest rising to the level of "good cause."

Before filing the motion to supplement the AR, Mr. Galuszka's counsel sought Reliance's permission to include the additional documents in the AR. He made this request one day prior to the filing of the parties' cross motions, but prior to the completion of their briefing, and several months in advance of the court's October 24, 2016 hearing. Reliance neither asked to amend its motion in light of Mr. Galuszka's request to supplement the AR, nor sought a continuance on that basis. It is thus reasonable to infer that Reliance suffered no real prejudice because of Mr. Galuszka's delay.

Reliance also can claim no unfair prejudice if the Allsup letter and the SSDI Decision are included in the AR. Reliance was aware of Mr. Galuszka's SSDI application and the fully favorable SSDI Decision well in advance of its January 6, 2015 final claims determination. It also factored the outcome of the SSDI Decision in its decision.

Although Mr. Galuszka bears the burden of proof, Reliance had an independent duty to ensure that the record before it was sufficient for a fair and accurate claims determination. *See Metro. Life v. Glenn*, 554 U.S. 105, 116 (2008) (noting the claim administrator's independent burden to ensure accurate claims assessment and declining "to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review"); *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 313 (2d Cir. 2006) ("ERISA requires that benefit plans give a full and fair review by the appropriate named fiduciary of the decision denying the claim.") (quoting 29 U.S.C.

6

§ 1133(2)) (internal quotation marks omitted).  Reliance promised Mr. Galuszka that it would conduct "[a]n investigation . . . in order to gather the necessary information to determine your continued eligibility for LTD benefits."  (AR 289.)  If Allsup's letter and the SSDI Decision provided relevant information, Reliance could and should have ensured their inclusion in the AR.  *See, e.g., Mead v. ReliaStar Life Ins. Co.*, 755 F. Supp. 2d 515, 526 (D. Vt. 2010) (noting that as part of its benefits determination on remand, "ReliaStar obtained Mead's Social Security Administration ('SSA') disability claims file.").

"ERISA and its accompanying regulations 'were intended to help claimants process their claims efficiently and fairly; they were not intended to be used . . . as a smoke screen to shield [insurers] from legitimate claims.'"  *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 696 (7th Cir. 1992) (citations omitted).  For this reason, ERISA and its implementing regulations require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."  *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  To the extent that there was no meaningful dialogue about the contents of the AR before Reliance rendered its final claims determination, the fault lies with both parties.[4]

Reliance's further contention that the SSDI Decision is immaterial to this court's *de novo* review is untenable.  Courts may consider a SSA determination in determining

---

[4] *Ingravallo v. Hartford Life & Accident Ins. Co.*, 563 F. App'x 796 (2d Cir. 2014) does not require a contrary conclusion.  In that case, the written plan documents conferred upon the plan administrator the discretionary authority to determine benefits eligibility.  The district court faulted the plan administrator for failing to obtain a copy of an SSA decision favorable to the claimant before rendering a decision.  The Second Circuit concluded that the district court erred in this criticism, noting that while it has "encourage[d] plan administrators, in denying benefits claims, to explain their reasons for determining that claimants that are not disabled where the SSA arrived at the opposite conclusion," it could not fault the plan administrator for failing to provide a more complete discussion of the SSA decision when the claimant "presented no documents disclosing the basis for the SSA's decision" and where "the record does not reflect that the SSA conducted any reevaluation of [the claimant's] condition after its initial award—with which [the insurer] agreed—in 2006."  *Id.* at 799 (internal quotation marks omitted).  In contrast, in this case, the fully favorable SSDI Decision was contemporaneous with Reliance's disability determination, was obtained with Reliance's assistance, and addressed the same relevant time period as Mr. Galuszka's LTD benefits application.

whether a claimant is entitled to benefits under ERISA. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) ("True, the SSA's determination did not bind either the ERISA Plan or the district court. However, it does not follow that the district court was obligated to ignore the SSA's determination, especially if the district court found the determination probative, if not necessarily dispositive, as was the case here."); *see also Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 92 (2d Cir. 2009) ("We encourage plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion[.]"). This is especially true where, as here, the ERISA plan administrator played a role in obtaining the SSDI Decision. *See Glenn*, 554 U.S. at 118 (observing that the court of appeals properly "found questionable the fact that MetLife had encouraged [the claimant] to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so . . . and then ignored the agency's finding in concluding that [the claimant] could in fact do sedentary work"). A court is well-equipped to analyze whether the two decision-makers were presented with materially different factual records and used different standards to determine disability.

Finally, the Allsup letter and the SSDI Decision are not duplicative or cumulative of other information in the AR. They thus present helpful additional information to assist this court's determination of whether Mr. Galuszka is "totally disabled" under the Policy. Inclusion of the Allsup letter and the SSDI Decision in the AR is also consistent with the court's and the parties' obligation to secure the just determination of this proceeding. *See* Fed. R. Civ. P. 1. Because "good cause" exists to supplement the AR, the court hereby GRANTS Mr. Galuszka's motion (Doc. 20) to include Documents 20-3 and 20-4 in the AR. The court therefore need not decide whether Reliance's relationship with Allsup rises to the level of a conflict of interest.[5]

---

[5] This issue presents a close question that would benefit from a more complete description of the relationship between Reliance and Allsup, if any.

## III.    Findings of Fact.

### A.    Mr. Galuszka's Claim.

In 2009, Mr. Galuszka accidentally shot himself in the left foot while black powder hunting during deer season. His injury required an initial hospitalization followed by multiple surgeries, and a partial transmetatarsal amputation.

At the time of his accident, Mr. Galuszka was employed as a respiratory therapist at NMC in St. Albans, Vermont.[6] He has approximately eleven years of experience as a respiratory therapist and has an Associate Degree in Science from Champlain College. Although Mr. Galuszka was initially able to return to work after his accident, he thereafter developed pain that made it difficult for him to walk. X-rays taken on February 8, 2012 revealed "bony fragments and metallic appearing foreign bodies in [his] foot." (Doc. 20-3 at 2.)

On March 22, 2012, David Groening, D.P.M., performed transmetatarsal amputation and revision surgery on Mr. Galuszka's left foot. Mr. Galuszka stopped working at NMC on the day prior to his revision surgery. On March 26, 2012, he filed a claim for benefits under the Policy and for a waiver of premium ("WOP").[7] He supplemented his claim with a statement from his podiatrist, Dr. Groening, that he had been diagnosed with "pain [secondary] to bone fragments, exostosis & foreign bodies." (AR 673.) In May of 2012, Dr. Groening recommended that Mr. Galuszka not return to work for a month which was later extended to July 20, 2012.

In a July 9, 2012 telephone interview, Mr. Galuszka advised Reliance that his prognosis for returning to work was "unknown" and that he was "still in a great deal of pain." (AR 278.) When asked to explain his current activities in a typical day, he

---

[6] According to NMC's job description, respiratory therapists "provide medically sanctioned therapeutic modalities to patients" and use a variety of equipment including volume and pressure limited ventilators, non-invasive ventilator support systems, and electrocardiographs, among others. (AR 675.)

[7] NMC offered its employees the Life Insurance Policies through Reliance. The Life Insurance Policies provide for a WOP in the event of the claimant's "total disability." (AR 349.) Mr. Galuszka filed a timely claim for a WOP and extension of coverage under the Life Insurance Policies.

9

indicated that he was "[s]itting with foot elevated a lot" but he could go to the grocery store, take short walks, and do his own cooking, housework, and yard work. *Id.* He noted that the part of his position as a respiratory therapist that he could not perform was "[n]eeds to be on feet all day." *Id.* He advised Reliance that he had not applied for any Social Security Act benefits because he hoped to return to work.

On July 30, 2012, Reliance approved Mr. Galuszka's claim for monthly benefits under the Policy after the elimination period based on its determination that Mr. Galuszka could no longer work as a respiratory therapist as of March 22, 2012. Reliance informed Mr. Galuszka that, after his receipt of twenty-four months of benefits, he would be required to establish that he was "totally disabled" as defined by the Policy in order to receive LTD benefits. Reliance advised Mr. Galuszka that it would conduct an investigation prior to its final benefits determination. Mr. Galuszka began receiving benefits accrued as of June 20, 2012, and was scheduled to receive benefits until June 20, 2014.

### B.  Complex Regional Pain Syndrome.

The parties are in agreement that Mr. Galuszka suffers from complex regional pain syndrome. According to a SSA publication dated October 20, 2003, "complex regional pain syndrome," which is also known as reflex sympathetic dystrophy syndrome, is:

> a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. . . . The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma.

(Doc. 20-1 at 3.) "It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual." *Id.* The condition is characterized by symptoms including: "[s]welling; [a]utonomic instability—seen as changes in skin color or texture, changes in sweating[,] . . . changes in skin temperature, and abnormal pilomotor erection[;] [a]bnormal hair or nail growth[;] [o]steoporosis; or [i]nvoluntary movements of the affected region of the initial injury." *Id.* at 6. The SSA publication further acknowledges that:

> [c]hronic pain and many of the medications to treat it may affect an individual's ability to maintain attention and concentration, as well as adversely affect his or her cognition, mood, and behavior, and may even reduce motor reaction times. These factors can interfere with an individual's ability to sustain work activity over time, or preclude sustained work activity altogether.

*Id.* at 7.

In his briefing, Mr. Galuszka references the National Institute of Neurological Disorder and Stroke's (the "NINDS") definition of complex regional pain syndrome. The court finds the NINDS's website provides a useful source of information regarding complex regional pain syndrome that supplements and corroborates the information set forth in the SSA publication. Pursuant to Fed. R. Evid. 201 and subject to the parties' right to object, the court takes judicial notice of the NINDS's definition which provides in relevant part:

> Complex regional pain syndrome (CRPS) is a chronic pain condition most often affecting one of the limbs (arms, legs, hands, or feet), usually after an injury or trauma to that limb. CRPS is believed to be caused by damage to, or malfunction of, the peripheral and central nervous systems. The central nervous system is composed of the brain and spinal cord, and the peripheral nervous system involves nerve signaling from the brain and spinal cord to the rest of the body. CRPS is characterized by prolonged or excessive pain and mild or dramatic changes in skin color, temperature, and/or swelling in the affected area.
>
> . . .
>
> CRPS symptoms vary in severity and duration. Studies of the incidence and prevalence of the disease show that most cases are mild and individuals recover gradually with time. In more severe cases, individuals may not recover and may have long-term disability.
>
> . . .
>
> The key symptom is prolonged pain that may be constant and, in some people, extremely uncomfortable or severe. The pain may feel like a burning or "pins and needles" sensation, or as if someone is squeezing the affected limb. The pain may spread to include the entire arm or leg, even though the precipitating injury might have been only to a finger or toe. Pain can sometimes even travel to the opposite extremity. There is often increased sensitivity in the affected area, such that even light touch or contact is painful (called *allodynia*).

11

People with CRPS also experience constant or intermittent changes in temperature, skin color, and swelling of the affected limb. This is due to abnormal microcirculation caused by damage to the nerves controlling blood flow and temperature. An affected arm or leg may feel warmer or cooler compared to the opposite limb. The skin on the affected limb may change color, becoming blotchy, blue, purple, pale, or red.

Other common features of CRPS include:

- changes in skin texture on the affected area; it may appear shiny and thin
- abnormal sweating pattern in the affected area or surrounding areas
- changes in nail and hair growth patterns
- stiffness in affected joints
- problems coordinating muscle movement, with decreased ability to move the affected body part, and
- abnormal movement in the affected limb, most often fixed abnormal posture (called *dystonia*) but also tremors in or jerking of the affected limb.

www.ninds.nih.gov (last visited January 9, 2017).

## C.    Mr. Galuszka's Relevant Medical Treatment.

Following Mr. Galuszka's revision surgery, in March and April of 2012, Dr. Groening noted that Mr. Galuszka did not initially have any acute pain and on April 18, 2012 recorded that Mr. Galuszka stated he was "doing well" and "doing better" and experiencing a "minimal amount of edema." (AR 628, 1286.) By May of 2012, however, Mr. Galuszka reported to Dr. Groening that he was "unable to stand/walk for more than 30 minutes without a break[,]" was "still having a significant amount of pain[,]" and was "not able to do some of the activity that he was able to do previously . . . [because] it is so painful that he is not able to bear all of his weight." (AR 629, 635.)

On June 12, 2012, Mr. Galuszka advised Dr. Groening that "he believes that he still has more pain than he did pre-operatively." (AR 629.) On July 24, 2012, after noting that Mr. Galuszka continued to have pain,[8] Dr. Groening referred him to William Roberts, M.D., a pain specialist.

---

[8] In a SSA questionnaire dated February 22, 2013, Dr. Groening indicated that the medical basis for Mr. Galuszka's pain is "complex regional pain syndrome" and that his pain is "disabling to the extent that it would prevent the patient from working full time at even a sedentary position."

In his report, Dr. Roberts noted that he had seen Mr. Galuszka after his accident and that he "had a significant amount of pain." (AR 596.) He recorded that Mr. Galuszka "subsequently underwent debridements and then a complete amputation and then a revision amputation since then." *Id.* Because Reliance relies on Dr. Roberts's treatment and opinions as evidence that Mr. Galuszka is not "totally disabled,"[9] the court quotes from Dr. Roberts's report at some length:

> I have not seen [Mr. Galuszka] since the February 2010 [accident] except in the hallways at work. My understanding from him is that he is working very little as a result of uncontrolled pain. He described allodynia at the site of the incision on the left foot and distal and what would be approximately the metatarsals of the 3 and 4. He also has complained of alternating having a cold foot or warm foot. Today, it was cold. There is no indication that he has had any new trauma. He is not sure if something is getting pinched between his metatarsals. I am open to the possibility that that could be the case, but I think it is important that we consider the mechanism of injury and most important the interval of time between the injury and his definitive therapy which was several weeks.
>
> He denies any vasal motor instability as evidenced by hyperhidrosis. He does have coloration changes.
>
> He is a well-appearing white male with no difficulty with his gait or station. There is a well-healed, well coapted wound across the mid portion of the metatarsals of the left foot. This appears to be a very nicely closed and healed transmetatarsal amputation. There is no indication of any dystrophic changes of the skin. There is no indication of any peripheral vascular compromise. His capillary refill is quite brisk. He does have true allodynia in the areas outlined above, but overall, the foot is very cold, as compared to the opposite side. There is no indication of any true mottling, but he does have an overall general rosy hue to the left foot as compared to the right.

(AR 1426.) He further opined that Mr. Galuszka's pain and/or the side effects of his medication would impose moderate to severe limitations on his attention and concentration. In rendering this opinion, Dr. Groening acknowledged that he had not evaluated Mr. Galuszka since July 2012.

[9] *See, e.g.*, Doc. 32 at 6 (noting that Dr. Roberts, a pain specialist, "was unable to determine the cause of Plaintiff's complaints of pain" and concluded that there would be "no point" in "further efforts" with regard to "interventional care"); *id.* at 14-15 (pointing out that "Plaintiff's brief completely omits any reference to Dr. Roberts" who could not "immediately determine the cause of Plaintiff's complaints of pain").

13

There is no thickening of the hairs, nor any hyperhidrosis.

Somewhat difficult to determine if this is an automatically mediated pain process without doing a diagnostic paravertebral chemical sympathectomy. Certainly, I would not want to miss the diagnosis without aggressively considering that this could be an autonomically mediated pain problem. Today we discussed the diagnostic features of a paravertebral chemical sympathectomy and the therapeutic features of permanent surgical sympathectomy. I have sent him home with key words and we will review with him his questions after he has had a chance to look into these. He was told that he could come back even today if he had an adequate duration of time to read through some web sites and consider the diagnosis of complex regional pain syndrome.

(AR 596-97.)

Thereafter, on June 21, 2012, Dr. Roberts administered a paravertebral block to Mr. Galuszka which was unsuccessful in relieving his pain. During the procedure, Dr. Roberts was able to document a temperature differential in Mr. Galuszka's feet. *See* AR 599 ("Temperature differential was clearly documented, left side being nearly 9 degrees cooler than the right."). He also noted "[o]f interest is the fact that David points out that when he was having problems with his neck he had entirely right-sided basil motor symptoms, sweating profusely in the right with no sweating whatsoever noted on the left." *Id.* Dr. Roberts observed that "[i]t is not clear to me if his failure to vaso-dilate is the result of failure to obtain access on the paravertebral sympathetic motor ganglia or if his sympathetic nervous system simpl[y] does not have normal motor function[.]" *Id.*

On June 25, 2012, Dr. Roberts documented that Mr. Galuszka "had no improvement in either his vasomotor symptoms or pain following a chemical paravertebral sympathectomy last week." (AR 600.) He noted that "there is no improvement in his reticular pattern of discoloration in his foot" and "[h]is foot continues to be cold as compared to his nonoperative side." *Id.* After a consultation, Mr. Galuszka agreed to undergo the procedure a second time. This, too, proved unsuccessful as "[h]e neither vasodilated nor had any pain relief during the block" and "no interval improvements in his symptoms either." (AR 602.) During the two hours following the block, Dr. Roberts noted "differential temperatures went from a temperature differential

14

of 14 degrees with the right foot being warmer than the left to a differential of only 6 degrees. Unfortunately, from my point of view, the left side did not warm up. It was the right side that cooled." (AR 603.)

On July 9, 2012, Dr. Roberts met with Mr. Galuszka to discuss the two paravertebral blocks that had produced no modification in Mr. Galuszka's pain. Dr. Roberts offered to refer Mr. Galuszka for a third procedure, but opined that "it is very unlikely that his outcome would be improved by a third opportunity." (AR 604.) In his report to Mr. Galuszka's primary care physician, Dr. Roberts opined that he was "not willing to determine this to definitively be a diagnosis of complex regional pain syndrome[.]" *Id.* He noted that he had:

outlined [Mr. Galuszka's] options and unfortunately there are very few that I can see. He has previously been on a maximal dose of Neurontin and the current pain does not seem to be particularly neuropathic. I did offer to him and he accepted a prescription for Lyrica. With regards to interventional care, I see no point in any further efforts in that direction.

(AR 604-05.)

On September 25, 2012, after receiving Dr. Roberts's report, Stewart Manchester, M.D., Mr. Galuszka's primary care physician, diagnosed Mr. Galuszka with reflex sympathetic dystrophy/complex regional pain syndrome. On February 4, 2013, Dr. Manchester recorded that Mr. Galuszka suffered from fatigue, chest pain (but not palpitations), shortness of breath, abdominal pain, headaches, and dizziness. On July 5, 2013, Dr. Manchester observed that Mr. Galuszka "denie[d] medication side effects" but "report[ed] doing poorly" with interval symptoms of "worsened localized pain, worsened light touch hypersensitivity, worsened thermal hypersensitivity, worsened numbness, worsened edema, worsened alteration in skin color and worsened alteration in skin temperature." (AR 368.)

During the 2012 and 2014 time period, Mr. Galuszka also consulted with Mario Serafini, D.O., of the Center for Pain Medicine at Fletcher Allen Health Care ("Fletcher Allen") for treatment of his pain-related symptoms. On July 25, 2012, Mr. Galuszka complained to Dr. Serafini that he was experiencing left foot pain radiating to the left

15

calf, which he described as "sharp, aching, cramping, cutting and shooting in character." (AR 1338.) He further reported significant hypersensitivity to light touch, sensitivity to cold, difficulty wearing a sock and shoe, and temperature changes in his left foot. He indicated that his "average pain intensity is 5/10 and is aggravated by walking." *Id.* He also experienced "significant interruption in his sleep pattern due to nighttime pain." *Id.* Dr. Serafini opined that "[t]he patient's chronic pain has negatively impacted level of function, resulting in lower general activity level, a depressed mood, more difficulty walking, more difficulty performing normal work, less enjoyment of life, poor sleep and difficulty performing the basic activities of daily living." *Id.* Dr. Serafini noted that "[n]othing alleviates the pain." *Id.* Dr. Serafini assessed "[p]hantom limb pain, toes, left foot" and "neuropathic pain" and noted that there was a possible component of scar neuroma and "[p]ossible component of chronic regional pain syndrome[.]" (AR 1340.) Dr. Serafini recommended pain medication and discussed the possibility of a repeat sympathetic block.

On September 13, 2012, Dr. Serafini noted that Mr. Galuszka's "average pain intensity is 6/10 and is aggravated by walking" and that there "is also significant interruption in his sleep pattern due to nighttime pain." (AR 1247.) A pain specialist at Fletcher Allen, Kevin Lien, M.D., noted on October 22, 2012 that Mr. Galuszka's pain was "5/10 usually, but can get to 10/10." (AR 1327.) Mr. Galuszka described the pain as "crushing" and "burning" and complained of hypersensitivity and allodynia in both lower extremities, sweating changes and mottling in the upper and lower extremities, and muscle spasms "all over." *Id.* Dr. Lien stated that Mr. Galuszka "has a very complex picture, and it seems as if his symptoms are progressing to involve his right lower extremity and upper extremities." (AR 1328.)

Thereafter, on November 8, 2012, Mr. Galuszka received spinal cord simulator ("SCS") lead implants. That same day, Dr. Serafini recorded an assessment of "complex regional pain syndrome type I of lower limb" and "neuropathic pain." (AR 1396.) The SCS leads were removed the following day because Mr. Galuszka had no "significant reduction of his typical pain of the lower extremities[.]" (AR 1239.)

During a November 30, 2012 visit, Dr. Serafini opined that Mr. Galuszka presents "a very complex picture, and it seems as if his symptoms are progressing to all his extremities and torso." (AR 1391.) Dr. Serafini recorded that Mr. Galuszka "recently went on a deer hunting expedition, but afterwards suffered increased swelling in both lower extremities. It was so extensive that he had problems with putting on his pants and boots." (AR 1390.) On February 20, 2013, Dr. Serafini determined that there "still seems to be an escalation of symptoms" and that "[t]here is still significant amount of left foot and ankle pain, as well as persistent color changes and spasm of the left calf." (AR 1372.) Dr. Serafini also noted that Mr. Galuszka was suffering abdominal pain and bladder discomfort.

By April of 2013, Dr. Serafini assessed Mr. Galuszka's condition as follows: "[c]hronic opiate management with an improved level function and no reported side effects. Some relief with current medical management for chronic regional pain syndrome. Complex collection of symptoms continues." (AR 1024.) In May of 2013, he noted "[t]here is still significant amount of left foot and ankle pain, as persistent color changes and spasm of left calf but currently he is more focused on other system complaints. This includes ongoing abdominal discomfort, generalized numbness and sweating issues, visual changes and difficulty hearing." (AR 1026.) Dr. Serafini observed that Mr. Galuszka was "positive for fever chills excessive fatigue sweats," "positive for shortness of breath at rest," "positive for involuntary movements, numbness, weakness" but exhibited a normal gait and was "alert, cooperative, [and in] no apparent distress." (AR 1027.)

On May 6, 2013, Mr. Galuszka was seen by Christine Jones, M.D., a rheumatologist at Fletcher Allen. Dr. Jones noted that Mr. Galuszka "appear[ed] chronically ill and tired today," his affect was "sad," and he exhibited decreased eye contact. (AR 437.) She recorded "a complex group of signs and symptoms" and assessed that "[t]he complex regional pain syndrome diagnosis seems to be correct." (AR 437-38.) She noted Mr. Galuszka "sweats at various times throughout the exam," exhibited "nail pitting [and] [f]ingertips [that] are cool and mottled[,]" and "edema in the

17

right lower shin more so than the left[.]"  (AR 437.)  She further observed "slow and stiff lateral neck rotation," "negative head retraction reflex[,]" "preserved but very painful" shoulder range of motion, decreased bilateral hip range of motion, "allodynia with palpitation in the lower extremities" and "degenerative changes" in the knees and right forefoot.  *Id.*

Dr. Jones treated Mr. Galuszka again on July 11, 2013, and noted he exhibited limited neck extension, "diffuse tightness and tenderness in his spine," and antalgic gait.  (AR 849.)  She observed that there had been recent adjustments in the numerous prescribed medications Mr. Galuszka was taking including the addition of Cymbalta therapy.  Mr. Galuszka reported that "he continues to be active despite hurting all the time," that his "sleep remains significantly disordered," and that he was "seen by Dr. Erickson and feels that any depression that he has is related to the chronic pain and significant disruption of his life."  (AR 847.)  She described him as "sad and tired" but with "fluent, pleasant speech."  (AR 849.)  She noted that Mr. Galuszka's gait was antalgic and that he had to stand several times during the examination due to significant upper back discomfort.  She found his ability to exercise was "somewhat limited" by his complex regional pain syndrome.  *Id.*

In addition to complex regional pain syndrome, Dr. Jones diagnosed Mr. Galuszka with migraines, depression, and irritable bowel syndrome.  She ruled out the possibility that he had "stiff man syndrome as well as ankylosing spondylitis" (AR 847) and concluded that a diagnosis of fibromyalgia was inconclusive.  She pointed out changes in his right hip that "might be evaluated by an MRI[,]" but Mr. Galuszka felt that "his pain is diffuse and global" and "he would rather focus on controlling his pain than this single joint."  (AR 849.)  Dr. Jones opined that "it makes sense to deal with his global pain syndrome as well as his complex regional pain syndrome through Dr. Serafini and his PCP."  *Id.*

Mr. Galuszka sought treatment from Joseph Salomone, M.D. and Thomas Suppan, M.D. of NMC, and Nicholas Zubarik, M.D. of Fletcher Allen for abdominal and gastrointestinal pain between March and May of 2013, and again in August of 2013.

18

Following a biopsy and other procedures, Dr. Salomone reported on September 3, 2013 that Mr. Galuszka suffered from "[e]xtensive intestinal metaplasis" and that "acute neutrophilic inflammation is very minimal and distributed in a very focal manner." (AR 804.)  Mr. Galuszka also underwent a stress test and cardiac evaluation of "stress induced chest pain which is resolved spontaneously." (AR 457.)

Dr. Serafini reevaluated Mr. Galuszka on June 13, 2013 and recorded a "complex collection of symptoms which is increasing his suffering" which included "hearing changes, visual changes, multi-joint pain, headaches, as well as bowel and bladder discomfort." (AR 1029.) Dr. Serafini noted diagnoses of interstitial cystitis and irritable bowel syndrome.  A review of Mr. Galuszka's systems revealed excessive fatigue, sweats, both cold and hot flashes, chest pain, hair changes, skin temperature and color changes, nail changes, numbness, weakness, and muscle spasm.

On July 10, 2013, Dr. Serafini recorded that Mr. Galuszka "continues to have a higher-level function with his current medical management" and is "currently not experiencing any unacceptable side effects." (AR 1146.) Mr. Galuszka rated his pain as a "6/10." *Id.* Dr. Serafini treated Mr. Galuszka again on August 6, 2013, noting that "[o]verall [Mr. Galuszka] appreciates significant relief although it continues to remain incomplete" and that his "pain for the most part has remained the same in distribution and character but the intensity overall is less with his medical management." (AR 1150.)

On September 4, 2013, Mr. Galuszka complained to Dr. Serafini of "discomfort in the abdominal region, bladder, bilateral upper and lower extremities as well as headaches. He also has some associated visual changes, hearing changes, jaw pain and head discomfort." (AR 1154.)[10] Dr. Serafini prescribed Valium to Mr. Galuszka, increasing the five milligram dosage to twice per day.

---

[10] Mr. Galuszka visited Tamara Rimash, M.D., an ear, nose, and throat specialist at Fletcher Allen, on May 21, 2013 for an otologic examination.  Dr. Rimash noted that an audiogram indicated mild high-frequency sensorineural hearing loss, and that an MRI indicated that the internal auditory canal is "normal in appearance and no retrocochlear pathology is seen." (AR 428.)  In June and August of 2014, Mr. Galuszka visited Gregory Brophey, M.D., an ophthalmologist at NMC, seeking treatment for cataracts and dry eyes.  Dr. Brophey categorized

On September 11, 2013, Dr. Manchester submitted a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" on a form provided by the SSA. (AR 1124-34.) Dr. Manchester opined that Mr. Galuszka could lift and carry up to ten pounds "occasionally" and could "never" lift and carry more than that amount. (AR 1124.) In support of these limitations, Dr. Manchester cited his "medical or clinical findings" of "diffuse pain & stiffness [and] fatigue[.]" *Id.*

Dr. Manchester stated that Mr. Galuszka could sit and stand for fifteen minutes at a time and for a maximum of one hour each in an eight-hour work day. He opined that Mr. Galuszka could walk for five minutes at a time with a maximum of one hour of walking per eight-hour work day. The remainder of his work day Mr. Galuszka would need to lie down, with his leg elevated, and with frequent changes in position. Dr. Manchester noted that Mr. Galuszka did not require a cane and that if he used one, he could use his free hand to carry small objects. He attributed Mr. Galuszka's limitations to complex regional pain syndrome/sympathetic dystrophy with additional findings of "diffuse pain & stiffness, poor focus, poor concentration, poor memory, poor coping, and exceptional fatigue." *Id.*

Dr. Manchester found that Mr. Galuszka could "occasionally" operate foot controls with both feet and could "occasionally" engage in reaching, reaching overhead, handling, fingering, feeling, pushing and pulling with both hands. He attributed these limitations to "pain and stiffness [that] severely limits use" and to the "partial amputation" of Mr. Galuszka's left foot. (AR 1126.)

Dr. Manchester found that Mr. Galuszka could "occasionally" climb stairs and ramps, but could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (AR 1127.) He further indicated that Mr. Galuszka's impairments affected his hearing or vision because of "severe headache" and "poor focus, poor memory, poor concentration[.]" *Id.* He opined that Mr. Galuszka could "occasionally" operate a motor vehicle but could "never" tolerate unprotected heights, moving mechanical parts,

Mr. Galuszka's reported visual ailments as "VISUAL DISTURBANCE SUBJECTIVE UNSPEC[.]" (AR 829.)

Case 2:15-cv-00241-cr Document 38 Filed 01/09/17 Page 21 of 49

humidity or wetness, dusts, odors, fumes or pulmonary irritants, extreme hot or cold,
vibrations, or stress and bright lights, noting that complex regional pain syndrome is
"exacerbated by external triggers." (AR 1128.)

With regard to Mr. Galuszka's daily activities, Dr. Manchester opined that Mr.
Galuszka could engage in most of the activities listed on the SSA form, except he could
not walk a block at a reasonable pace on a rough or uneven surface, could not climb a
few steps at a reasonable pace with the use of a single hand rail, and could not sort,
handle, or use paper files. Dr. Manchester stated that the limitations he indicated
reflected both Mr. Galuszka's status as of September 11, 2013, as well as his limitations
since December 6, 2009. He opined that these limitations could be expected to last for at
least twelve consecutive months in the future.

On September 11, 2013, Dr. Manchester also completed a Medical Source
Statement of Ability to Do Work-Related Activities (Mental) on a form provided by the
SSA. He opined that Mr. Galuszka had "marked" limitations in the ability to understand,
remember, and carry out simple and complex instructions. He also noted "marked"
restrictions on his ability to make judgments on simple or complex work-related
decisions. He identified "poor focus, poor concentration, poor memory, poor coping
[and] extreme fatigue from medication" as the factors that supported his assessment. (AR
1131.) He also found Mr. Galuszka had "marked" restrictions in his ability to interact
with the public, supervisors, and co-workers and respond appropriately to usual work
situations and to changes in a routine work setting. He cited "poor focus, poor coping,
easily irritable, severe fatigue" as factors that supported this assessment. (AR 1132.)

While awaiting the outcome of his SSDI application, Mr. Galuszka continued to
seek relief for his pain. During an October 10, 2013 visit, Dr. Serafini recorded Mr.
Galuszka's most significant period of improvement:

Mr. Galuszka presents for reevaluation and medical management check.
He appears overall much improved today as I believe a large component
[due] to spending time at a hunting cabin and some additional social
interactions. His pain has essentially remained unchanged in distribution
character with the exception of some upper extremity joint pain and

21

swelling. His affect appears to be dramatically improved over previous
visits. He reports no unacceptable side effects with current medical
management and reports an improved level of function. He is requesting
no medical changes. A significant benefit has been appreciated in spasms
and muscle pain from the advancement in the Valium.

(AR 1158.)

The amelioration in Mr. Galuszka's condition, however, proved temporary. By
December 2013, Dr. Serafini noted that Mr. Galuszka was experiencing "crushing" and
"continuous" pain that was "exacerbated [by] movement." (AR 1173.) He also exhibited
decreased strength, patchy hair on his bilateral upper and lower extremities, and
continued edema that forced him to keep his legs elevated. Dr. Serafini recorded that Mr.
Galuszka sometimes "furniture walks" at home for added stability. (AR 1173-74.)

As of February 2014, Dr. Serafini noted that Mr. Galuszka's pain was "consistent
with previous descriptions[,]" that his "frustration from disability to perform a lot of
activities of daily living seems to have increased[,]" and that his "depression may be
worse." (AR 797.) Dr. Serafini assessed "[s]ignificant limitations of daily living [due] to
underlying pain disorder, chronic regional pain syndrome[.]" *Id.* Similarly, in April
2014, he recorded that Mr. Galuszka's "chronic pain has negatively impacted level of
function, resulting in a lower general activity level, a depressed mood, more difficulty
walking, less social interaction, more difficulty performing normal work, less enjoyment
of life, poor sleep and difficulty performing the basic activities of daily living." (AR
895.)

On June 17, 2014, Dr. Serafini observed that Mr. Galuszka experienced "[m]arked
interruption of activities of daily living[,]" "[s]pasticity[,]" "[c]omplex medical
management[,]" "[g]ait disturbance[,]" and "[s]leep disturbance[.]" (AR 887.) Dr.
Serafini "remain[ed] concerned about his overall condition, his lack of improvement, and
the progression of symptoms both in range and severity." (AR 888.) Dr. Serafini noted
that Mr. Galuszka believed he "performs at a higher level of function with the medical
management including the opioids without unacceptable side effects." (AR 884.)

On July 14, 2014, Dr. Manchester recorded similar observations, noting that Mr. Galuszka "reports doing poorly" with "constant episodes of severe muscle spasms (worsening neck and back)." (AR 759.) His symptoms included "worsened localized pain, worsened light touch hypersensitivity, worsened thermal hypersensitivity, worsened numbness, worsened edema and worsened alteration in skin temperature." *Id.* Associated symptoms included "weakness, tremor, decreased range of motion, anxiety and depression." *Id.* Dr. Manchester observed that Mr. Galuszka was in "obvious pain" during the physical examination and had a vesicular rash on his arms and legs. (AR 760.)

On August 22, 2014, after Reliance terminated Mr. Galuszka's LTD benefits, Dr. Manchester completed two additional Medical Source Statement of Ability to Do Work-Related Activities (Mental) and (Physical) on forms provided by the SSA. With regard to Mr. Galuszka's physical limitations, Dr. Manchester opined that Mr. Galuszka could not concentrate or focus on job related tasks for a continuous two hour period during the workday and that his pain and/or the effects of prescribed medications resulted in "extreme" interference with those tasks.[11] He expected Mr. Galuszka's pace to be reduced more than twenty percent from a normal pace because of his impairments. He opined that Mr. Galuszka had approximately the same physical restrictions as previously indicated, and would need to lie down five times a day for thirty minutes in a full-time sedentary occupation. He opined that Mr. Galuszka could be expected to be absent "5 days per week" due to "severe physical pain" and "severe mental restriction" and that Mr. Galuszka's medication "adversely affected work-related functions" by virtue of "sedation" and "dizziness[.]" (AR 750.)

With regard to Mr. Galuszka's mental restrictions, Dr. Manchester filled out a SSA questionnaire indicating Mr. Galuszka had an anxiety-related disorder as evidenced by "[m]otor tension," "[a]utonomic hyperactivity," "[a]pprehensive expectation" and "[v]igilance and scanning." (AR 753.) He noted that Mr. Galuszka experienced "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense

---

[11] "Extreme" interference is defined as a limitation that "is present consistently or for more than 2/3 of the time of an eight-hour workday." (AR 747.)

23

apprehension, fear, terror, and sense of impending doom on the average of at least once a week" and "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress[.]" *Id.* Dr. Manchester further opined that Mr. Galuszka had five symptoms of "[d]epressive syndrome" including "[a]nhedonia or pervasive loss of interest in almost all activities," "sleep disturbance," "[d]ecreased energy," "[f]eelings of guilt or worthlessness" and "difficulty concentrating or thinking[.]" (AR 754.)

## D. Mr. Galuszka's SSDI Application.

As part of his SSDI application, on December 5, 2012, Mr. Galuszka, with the assistance of Allsup, completed a "Function Report" detailing his pain and functional limitations. In the Function Report, Mr. Galuszka stated that "[i]t takes me longer to get dressed because I move slowly. I sit down to put on my pants, socks and shoes because I have difficulty bending. I have difficulty reaching to pull a shirt on over my head and trouble handling snaps, buttons, and zippers with my hands." (AR 1362.) He stated that he could feed, shave, and bathe himself, but had "difficulty reaching to wash and comb my hair[,]" and "difficulty reaching to shave and gripping and using the razor[,]" and "difficulty bending and reaching to get items off of the shelves." (AR 1362, 1365.) He indicated that he was limited in the activities of lifting, squatting, standing, and walking and left tasks undone "due to fatigue, weakness and pain throughout [his] body." (AR 1366-67.)

Mr. Galuszka reported that he played simple and quick computer games because he had difficulty concentrating, sometimes paid bills late because he forgot when they were due and whether he had paid them, had to rewind television programs, reread paragraphs, and required repeat instructions due to difficulties in concentrating. He further reported that while watching television, reading, and playing computer games, he needed to shift positions frequently.

On June 3, 2013, Allsup submitted to the SSA a questionnaire completed by Mr. Galuszka wherein he stated that in addition to pain throughout his body, he had "severe abdominal pain bowel & bladder issues, migraine headaches, vision and hearing changes" and continued "problems with coordination, concentration, memory and

difficulty sleeping which leads to constant exhaustion." (AR 571.)  He stated that he was "limited in [his] ability to complete tasks and follow directions due to difficulty with concentration and memory issues."  (AR 568.)

In its January 17, 2014 letter, Allsup asked for a fully favorable decision with regard to Mr. Galuszka's SSDI application without waiving Mr. Galuszka's right to a hearing if a fully favorable decision on the record could not be rendered.  Allsup stated that Mr. Galuszka is a "younger individual with at least a high school education and past relevant work as a respiratory therapist and respiratory paraprofessional" who had not performed any substantial gainful work since his alleged onset date of March 21, 2012. (Doc. 20-3 at 1-2.)  Allsup noted that "the medical evidence of record provides a longitudinal history of the claimant's lengthy battle with chronic pain beginning prior to his alleged onset date," *id.* at 2, and that Dr. Manchester, Mr. Galuszka's primary care physician, had restricted Mr. Galuszka "to less than a full range of sedentary work activity." *Id.* at 3.  Allsup asserted that:

> [d]ue to his functional limitations, along with chronic severe pain, [Mr. Galuszka] is unable to persist at work like tasks on a "regular and continuing basis," meaning the full course of an 8 hour or 5 day work week. [Mr. Galuszka's] functional limitations and persistent high levels of pain would prevent him from meeting the quality, attendance, and production standards of competitive employment.  Furthermore, [Mr. Galuszka's] functional limitations restrict him to less than a full range of sedentary work and cause significant erosion of the occupational base.

*Id.* at 4.  Allsup requested a number of medical records be included in the administrative record.[12]

---

[12] The additional medical records included records dated February 18, 2013 from A. Cengiz Esenler, M.D.; Dr. Salomone's records dated February 20, 2013 through March 22, 2013; Dr. Manchester's records dated March 15, 2013 through May 14, 2013, and a Medical Source Statement dated September 11, 2013; Dr. Serafini's records dated April 12, 2013 through June 13, 2013; Dr. Brophey's records dated April 15, 2013 through June 24, 2013; Dr. Jones's records dated May 6, 2013 through July 11, 2013; Dr. Rimash's records dated May 21, 2013; and Dr. Zubarik's records dated May 24, 2013.

## E.    The SSDI Decision.

Without holding a hearing, ALJ Sutker issued findings of fact and conclusions of law approving Mr. Galuszka's SSDI application pursuant to a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a). ALJ Sutker found that Mr. Galuszka had not engaged in substantial gainful activity since March 21, 2012, his alleged onset date, and had two severe impairments: complex regional pain syndrome and osteoarthritis of the hands and hip. ALJ Sutker made the following additional findings:

The claimant reports . . . blood in stools, diarrhea, constipation, itching, hair loss, skin rash/changes, sun-induced rash, and hand/foot color changes wit[h] cold. His pain is in his back, knees, hips, legs, arms, abdomen, eyes, jaws, and head. He needs to shift position after sitting for prolonged periods of time and has pain standing or walking for prolonged periods of time as well. He has joint swelling and hypersensitivity in the legs and feet. He can feel cold sometimes and other times will perspire. He has trouble lifting, reaching, grasping, gripping, bending, squatting and kneeling and reports loss of coordination in the hands. He has difficulty concentrating and thinking and a poor short-term memory also plague him. He also reports some difficulty hearing on his left side.

Most if not all of these symptoms are reflected in the medical evidence of record or are reasonably consistent with his condition. Not all have existed for a consecutive period of 12 or more months. The complaint's activities of daily life are limited consistently with his subjective complaints[.]

(Doc. 20-4 at 7-8.)

ALJ Sutker found that Mr. Galuszka has the residual functional capacity to perform sedentary work, however he cannot climb ladders, can occasionally balance, can less than occasionally climb ramps/stairs, stoop, kneel, crouch and crawl, can tolerate no hazards or temperature extremes and "due to symptoms would be off task at least 20% of the workday." *Id.* at 9. She accorded moderate weight to the opinions of non-examining state agency medical consultants who opined that Mr. Galuszka could stand/walk for two hours out of an eight hour day and could frequently crouch and kneel, but only occasionally use his left foot, climb, and crawl. She gave "significant weight" to Dr. Manchester's opinions and Medical Source Statements. *Id.* at 10. In doing so, ALJ Sutker observed that:

26

> [a]ll treating sources are in accord that [Mr. Galuszka] has debilitating
> impairments. The undersigned notes that the record supports a finding of
> complex regional pain syndrome in that it has been diagnosed by
> acceptable medical sources and, in accordance with SSR 03-02p, the record
> documents swelling, decreased hair growth, allodynia, temperature changes
> and involuntary movements.

*Id.* (citations omitted).

ALJ Sutker further found that Mr. Galuszka's medically determinable impairments could reasonably be expected to produce his alleged symptoms and that his "statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible." *Id.* She concluded that Mr. Galuszka's past relevant work exceeded his residual functional capacity and that there were no jobs that exist in significant numbers in the national economy that Mr. Galuszka could perform because his functional limitations "so narrow the range of work [Mr. Galuszka] might otherwise perform [such] that a finding of 'disabled' is appropriate under the framework of this rule." *Id.* at 11.

On March 13, 2014, Attorney Morwood notified Reliance of the SSDI Decision. On April 24, 2014, Reliance responded that due to the retroactive award from the SSA, Mr. Galuszka's benefits under the Policy should have been reduced by $40,168.02. On May 29, 2014, Attorney Morwood advised Reliance that "Mr. Galuszka understands his obligation and will repay the same after he receives the full retroactive benefit from Social Security." (AR 960.)

### F.   Reliance's Residual Employment Analysis.

On June 3, 2013, Mr. Galuszka responded to a questionnaire from Reliance regarding his claim for benefits under the Policy. He stated that complex regional pain syndrome:

> persists and my symptoms have spread throughout my body causing
> constant pain in all areas including feet, legs, hands, arms, shoulders, hips,
> back & neck. In addition, I have severe abdominal pain[,] bowel & bladder
> issues, migraine headaches, vision and hearing changes. I continue to have
> problems with coordination, concentration, memory and difficulty sleeping
> which leads to constant exhaustion.

(AR 566.) Mr. Galuszka further stated that fatigue, weakness, and pain limited his ability to perform the following functions: "lifting, squatting, bending, standing for any period of time, reaching, walking, kneeling, stair climbing and sitting." (AR 568.) He reported difficulty completing tasks and following directions due to "concentration and memory issues." *Id.* Mr. Galuszka stated that he was taking the following medications: "Levorphanol, Clonidine, Lyrica, Diazepam, Amitriptyline, Androgel, Furosemide, Benadryl, Align Probiotic Supplement, and Hydrocodone-Acetaminophen[.]" *Id.*

On December 31, 2013, Jody Barach, Reliance's Manager of Medical and Vocational Services, conducted a Residual Employment Analysis ("RE Analysis") to assess Mr. Galuszka's ability to perform alternative occupations. Her RE Analysis noted that Mr. Galuszka's prior position of respiratory therapist entailed a "medium" exertion level with a Level 6 Specific Vocational Preparation. (AR 1493.) She concluded that Mr. Galuszka could perform the following occupational alternatives: Holter scanning technician, telemetry technician, clinic clerk, and blood bank order control clerk. Each of these occupations is classified as having a "sedentary" exertion level which "involves sitting most of the time, but may involve walking or standing for brief periods of time." (AR 1494.) All but the telemetry technician position require "frequent" reaching.

### G.    Reliance's Claims Determination.

On January 23, 2014, Reliance notified Mr. Galuszka that his benefits under the Policy would be terminated on June 20, 2014 because he was not "totally disabled" and was capable of performing "sedentary work activity." (AR 332.) The letter stated that Mr. Galuszka possessed transferable skills as a result of his work history that enabled him to perform the duties of the occupations identified in the RE Analysis. It further noted that there were no indications following his June 2013 and July 2013 visits with Dr. Serafini and Dr. Manchester that his conditions were disabling. As a result of this determination, Mr. Galuszka was no longer eligible for WOP and extension of the Life Insurance Policies. Mr. Galuszka appealed Reliance's claims determination.

**H.    Dr. Lewis's Review on Behalf of Reliance.**

In the course of its review of Mr. Galuszka's appeal, Reliance solicited the opinions of Jamie Lewis, M.D., who is board certified in Physical Medicine & Rehabilitation, regarding the extent of Mr. Galuszka's physical restrictions and limitations as of June 20, 2014.  Dr. Lewis did not physically examine Mr. Galuszka, but rather reviewed his treatment records and responded to nine "review questions" propounded by Reliance.  (AR 721-29.)

In his initial opinion dated October 23, 2014, Dr. Lewis found that Mr. Galuszka had "developed chronic regional pain syndrome" and had also been "assessed with tinnitus and hearing loss in the left ear and diminished hearing loss in the right ear."  (AR 726.)  He agreed that Mr. Galuszka's "primary diagnosis is complex regional pain syndrome, status post left transmetatarsal amputation" with a "secondary diagnosis of tinnitus, hypertension, and depression."  *Id.*  He noted Mr. Galuszka experienced "ongoing symptoms of pain and hypersensitivity to the extremities" and that "clinical evidence on examination reveals the claimant to have an antalgic gait, allodynia, [and] patch distribution of increased hair in the bilateral upper and lower extremities."  (AR 727.)

Dr. Lewis opined that "there is medical data to substantiate the presence of [Mr. Galuszka's] complaints" and that "[t]he prognosis for [his] returning to work without restrictions or impairment is poor."  (AR 726.)  Dr. Lewis nonetheless concluded that Mr. Galuszka had the capacity for full-time work over eight hours per day for forty hours per week with the following restrictions and limitations:

- Lifting, carrying, pushing and pulling 10 pounds occasionally and less than 10 pounds frequently.
- Sitting would be unrestricted.
- Walking and standing combined 10 minutes continuously for up to 2 hours a day.
- Bending, kneeling, squatting and crouching are occasional.
- No climbing ladders or working at heights.
- Reach overhead, at the waist level and below the waist level occasionally.

• Fingering, handling and feeling unrestricted.

(AR 727.)

Thereafter, Reliance advised Dr. Lewis that "[t]he rationale for [his overhead and waist level reaching] limitations is unclear." (AR 729.) In response, Dr. Lewis clarified his reaching restriction as follows: "To clarify, that should state, [Mr. Galuszka] can reach overhead, at the waist level unrestricted and below the waist occasionally." *Id.* He did not cite a clinical basis for this clarification.

After reviewing Mr. Galuszka's 2014 medical records, on December 15, 2014, Dr. Lewis revised his opinion and stated that "[t]here is evidence of decreased strength and swelling" and that "[m]ost recently [Mr. Galuszka] has localized pain and burning sensations. It is noted that he has light touch hypersensitivity, thermal hypersensitivity, numbness, edema, and alteration of skin temperature. He has an antalgic gait. There is evidence of skin breakdown." (AR 700.) He noted that Mr. Galuszka's restrictions and limitations were "ongoing and indefinite," but did not alter his opinion that Mr. Galuszka has "the capacity for full time work within the outlined restrictions." *Id.*

### I.    Reliance's Denial of Mr. Galuszka's LTD Benefits Claim.

In a letter dated January 6, 2015, Reliance denied Mr. Galuszka's appeal, noting that "based on Dr. Lewis's opinion, as well as the totality of the evidence" Mr. Galuszka was not "totally disabled" under the Policy. Reliance summarized Mr. Galuszka's medical records, noting Mr. Galuszka's apparent improvement documented in Dr. Serafini's October 10, 2013 treatment notes and the absence of medication side effects. The letter stated that, based on a review of Mr. Galuszka's medical records, he was capable of "performing full time work at the sedentary exertional level." (AR 354.) It further stated that the AR "fails to support the presence of an impairing mental nervous disorder" because it does not contain evidence of "physician treatment in conformance with generally accepted medical standards used to effectively manage and treat such a condition[,]" and because no mental status examination was performed. *Id.*

Reliance rejected Dr. Manchester's and Dr. Serafini's "document[ation of] the presence of anxiety and depression" because "these physicians do not document that Mr.

30

Galuszka is confused, disoriented or fatigued upon examination." (AR 355.) In addition, Reliance asserted that the SSDI Decision finding Mr. Galuszka disabled was not binding, and did not reflect Dr. Lewis's opinions and "other medical and vocational information [Reliance] may have developed in the file." *Id.*

On November 12, 2015, Mr. Galuszka filed suit against Reliance. On January 22, 2016, Reliance answered Mr. Galuszka's Complaint and asserted a counterclaim for $40,168.02, representing benefits under the Policy it allegedly overpaid in light of Mr. Galuszka's retrospective SSDI benefits award.

## IV.     Conclusions of Law and Legal Analysis.

### A.     Standard of Review.

The court's review and resolution of the parties' motions for judgment on the administrative record "can best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). This procedure is authorized by Fed. R. Civ. P. 52(a)(1), which provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *Id.* In actions arising under ERISA, "this form of bench trial [is] entirely proper." *Id.*

The court reviews Reliance's denial of benefits *de novo* because, as Reliance concedes, the Policy does not grant the plan administrator discretion to make final benefit determinations. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[A] denial of benefits challenged under [an ERISA claim] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").[13]

---

[13] *See also Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir. 2002) ("We conclude that the language of the Plan [requiring satisfactory proof of "Total Disability"] does not grant . . . discretionary authority."); *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202,

The *de novo* standard "applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999). It therefore requires "the district court [to not only] find the facts specially and state separately its conclusions of law thereon," the court must also "judge the credibility of the witnesses." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001) (internal quotation marks omitted).

It is Mr. Galuszka's burden to prove by a preponderance of the evidence that he is entitled to benefits under the Policy. *See Paese*, 449 F.3d at 441 (internal quotation marks omitted) (noting that plaintiff has "the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan").

**B.      Whether Mr. Galuszka Is "Totally Disabled" Under the Policy.**

Reliance does not dispute that Mr. Galuszka suffers from complex regional pain syndrome. Rather, it contends that Mr. Galuszka is capable of performing full-time sedentary work despite this diagnosis and has failed to prove he is "totally disabled" because he can perform at least one alternative occupation.

**1.      The Nature of Proof Required.**

As a threshold issue, Reliance asserts that Mr. Galuszka's claim was properly denied because it was based on his subjective complaints rather than on "objectively verifiable evidence." (Doc. 23 at 14-16.) The Policy, however, does not require "objectively verifiable evidence" and imposes no limitations on the type of evidence that constitutes "satisfactory proof" of "total disability." (AR 18.)[14]

---

1204 (9th Cir. 2000) ("No matter how you slice it, requiring a claimant to submit 'satisfactory proof' does not unambiguously confer discretion[.]"); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251 (2d Cir. 1999) (holding that a policy which requires a claimant to "'[s]ubmit satisfactory proof of Total Disability' is insufficient to preclude *de novo* review.").

[14] "Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they have choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). "Rather, employers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). As the drafter of the Policy, Reliance could have, but did not,

The Second Circuit has also not required a claimant to proffer "objectively verifiable evidence," especially in the context of a *de novo* review. It has, instead, held that "[s]ubjective pain may serve as the basis for establishing disability, even if . . . unaccompanied by positive clinical findings of other 'objective' medical evidence." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (citation omitted) (quoting *Sec'y of Dep't of Health & Human Servs.*, 721 F.2d 414, 418-19 (2d Cir. 1983)); *see also Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983) ("Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings.").[15] The court therefore cannot reject Mr. Galuszka's complaints of severe pain merely because they cannot be verified by accepted medical standards and depend in large part upon his self-reports. Provided the court weighs the evidence using an objective rather than a subjective standard, Mr. Galuszka may establish that he is "totally disabled" "even if [his pain is] unaccompanied by positive clinical findings or other 'objective' medical evidence." *Green-Younger*, 335 F.3d at 108 (citations omitted); *Marcus v. Califano*, 615 F.2d 23, 28 (2d Cir. 1979) ("Clinical findings . . . are not required to support a determination of severe, disabling pain."). To the extent that Mr. Galuszka can point to medical tests, procedures, and clinical observations that support his claim of debilitating pain, his claim will be buttressed.[16]

---

require a more exacting standard of proof. *See, e.g.*, *Ingravallo*, 563 F. App'x at 799 (noting that "under the Plan, a claimant's 'proof of loss' must comprise '[o]bjective medical findings,' which include, but are not limited to, 'tests, procedures, or clinical examinations standardly accepted in the practice of medicine.'") (alteration in original).

[15] Reliance cites *Gallagher v. Reliance Standard Life Insurance Co.*, 305 F.3d 264, 270 (4th Cir. 2002) for the proposition that on *de novo* review, the claimant's "satisfactory proof" must be "objectively satisfactory." (Doc. 23 at 24.) *Gallagher*, however, holds only that a claimant must first present his or her evidence to Reliance; the phrase "satisfactory proof" does not require a claimant to submit "proof of a total disability that Reliance finds subjectively satisfactory." *Gallagher*, 305 F.3d at 269 (emphasis supplied). "[T]he better reading of 'satisfactory proof' is that it establishes an objective standard, rather than a subjective one." *Kinstler*, 181 F.3d at 252.

[16] *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009) (concluding that "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported

2.    **Whether the SSDI Decision Supports a Finding of "Total Disability."**

Mr. Galuszka argues that the SSDI Decision supports his claim that he is "totally disabled" as defined by the Policy because ALJ Sutker made her determination using a similar definition of "disability." Although Reliance contends that the standards used by the SSA and the Policy are materially different, it does not explain how they are different and why they would produce divergent results.

In an application for SSDI, after establishing an inability to perform past work, a claimant must establish the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" in light of the claimant's "age, education, and work experience[.]" 42 U.S.C. § 423(d)(1)(A), (2)(A). Under the Policy, a "total disability" is present if a claimant "cannot perform the [full-time] material duties of any occupation" which is one which the claimant's "education, training, and experience will reasonably allow." (AR 10.)

"Although the SSA's definition of the term 'disability' is not necessarily coextensive with an ERISA plan's definition of that term," *Hobson*, 574 F.3d at 91-92, the Second Circuit has acknowledged that at least one other Circuit "considers an award of social security disability benefits to be a relevant factor in determining whether a claimant is disabled under an ERISA plan[.]" *Id.* at 91 (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)). Other Circuits have reached a similar conclusion. *See, e.g., Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998) (interpreting the phrase "unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are qualified, or become reasonably qualified by training, education or experience" and concluding that "[w]e shall proceed

---

claims of disability"); *Suren v. Metro. Life Ins. Co.*, 2008 WL 4104461, at *11 (E.D.N.Y. Aug. 29, 2008) (holding that "MetLife did not abuse its discretion when it based its opinion on objective tests and examinations, despite [claimant's] subjective complaints of fatigue and weakness").

on the assumption that 'total disability' under the plan means, at least insofar as Ladd's claim is concerned, the same thing as under the social security disability program.") (internal quotation marks omitted); *Torix v. Ball Corp.*, 862 F.2d 1428, 1430-31 (10th Cir. 1988) (finding the SSA's standard for "disability" and "gainful activity or employment" a useful concept for determining entitlement to disability benefits under an "any occupation or employment for remuneration or profit" standard); *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420 (11th Cir. 1984) ("In order to establish a reasonable interpretation of th[e] phrase [any occupation or employment for remuneration or profit] we turned for guidance to insurance policies with similar provisions and to cases construing the Social Security disability provisions.").

Reliance's request that the court disregard the SSDI Decision because it is based upon a different administrative record is equally unpersuasive. Although Reliance cites the Second Circuit's decision in *Hobson* in support of this contention, there, the Second Circuit merely found no error in a court's failure to consider a SSDI decision where "between the time Hobson submitted the diagnoses upon which the SSA awarded her disability" and Metlife's "LTD ERISA benefits" determination, "[the claimant] had undergone surgery for her colitis" and her benefits were terminated "on the basis that she had successfully recovered from this surgery; thus, the SSA's determination as to her presurgical condition was no longer relevant[.]" *Hobson*, 574 F.3d at 92.

In contrast, in this case, the administrative records before ALJ Sutker and this court reflect a roughly contemporaneous time period and do not appear to be materially different. Although Reliance contends that ALJ Sutker was not privy to all the records available to Reliance which would "refute the claim" (Doc. 32 at 19; Doc. 34 at 11), it does not explain how the missing records would have altered the outcome. Accordingly, while this court is not required to follow the SSDI Decision, nothing precludes it from considering it in reaching its own conclusions under the Policy. *See Paese*, 449 F.3d at 443 (holding that the district court was not obligated to ignore the SSA's disability determination).

### 3.    Mr. Galuszka's Credibility.

Shortly after his accidental shooting, Mr. Galuszka began complaining of significant pain for which he has consistently sought and obtained medical treatment. This treatment includes multiple surgeries, two paravertebral blocks, SCS lead implants, and an array of prescription pain medications. *Cf. Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("Our case law is clear that if a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain . . . such failure [may serve] as a basis for finding the complaint unjustified or exaggerated.  In the case of a complaint of pain, such failure may be probative of credibility, because a person's normal reaction is to seek relief from pain, and because modern medicine is often successful in providing some relief.").

Although Mr. Galuszka was initially able to return to work, and planned to return to work after his revision surgery, his pain precluded him from doing so. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir. 2007) ("It does not follow from the fact that a claimant tried to work for a short period of time, and because of his impairments, *failed*, that he did not then experience pain and limitations severe enough to preclude him for maintaining substantial gainful employment.  Indeed, we have suggested that similar evidence that a claimant tried to work and failed actually *supported* his allegations of disabling pain.").

Medical evidence in the record supports Mr. Galuszka's claims of extreme pain as consistent with a complex regional pain syndrome diagnosis.  Several of his treatment providers documented their own clinical observations of Mr. Galuszka's pain.  None of Mr. Galuszka's treatment providers apparently questioned whether his complaints of pain were credible or suggested they were tainted by exaggeration or malingering. *See Farnham v. Astrue*, 832 F. Supp. 2d 243, 266 (W.D.N.Y. 2011) (concluding complaints of pain were credible where plaintiff required surgical intervention and where treating physicians never "question[ed] the presence of Plaintiff's pain, [or] reduced, or stopped prescribing medication to alleviate [it].").  As ALJ Sutker found: "All treating sources are in accord that the claimant has debilitating impairments" and "the claimant's statements

36

concerning the intensity, persistence, and limiting effects of [his] symptoms are generally credible." (Doc. 20-4 at 10.)

Although Reliance did not challenge Mr. Galuszka's credibility as part of its final claims determination, it now points out that Dr. Serafini recorded that Mr. Galuszka's condition had improved and he was tolerating pain medication with acceptable side effects. While it is true that Dr. Serafini observed noticeable improvement in Mr. Galuszka's pain on isolated occasions, this improvement proved transitory. Shortly thereafter, Dr. Serafini noted that Mr. Galuszka's pain remained unchanged and that he was significantly impaired in his ability to perform the basic activities of daily living.

In support of its contention that Mr. Galuszka's daily activities are inconsistent with his claim of disabling pain, Reliance relies heavily on treatment notes indicating that Mr. Galuszka went on two separate deer hunting expeditions spaced approximately a year apart.[17] A review of the treatment notes reveals that they provide scant evidence regarding the extent of Mr. Galuszka's physical activity on the days in question. On November 30, 2012, Dr. Serafini noted that Mr. Galuszka "recently went on a deer hunting expedition, but afterwards suffered increased swelling in both lower extremities. It was so extensive that he had problems with putting on his pants and boots." (AR 1390.) On October 10, 2013, Dr. Serafini recorded that Mr. Galuszka "appears overall much improved today as I believe a large component d[ue] to spending time at a hunting cabin and some additional social interactions." (AR 1158.) These isolated references do not undermine Mr. Galuszka's credibility, but rather are more reasonably interpreted as evidence of his efforts to live a normal life despite his debilitating pain. *See Wilson v. Colvin*, 2016 WL 5661973, at *6 (W.D.N.Y. Oct. 3, 2016) ("Courts in this Circuit repeatedly have recognized that a [c]laimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time

---

[17] Reliance apparently did not rely on Mr. Galuszka's deer hunting activities in denying him LTD benefits, as neither its final claims decision nor Dr. Lewis's subsequent medical record reviews refer to those events.

37

comparable to those required to hold a sedentary job.") (internal quotation marks and citations omitted); *Moss v. Colvin*, 2014 WL 4631884, at \*33 (S.D.N.Y. Sept. 16, 2014) ("There are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job.") (citation omitted); *see also Demirovic*, 467 F.3d at 214-15 (holding "that disability provisions such as the one at issue here cannot be interpreted with undue strictness" so that a "total disability" would only exist only if the person was "utterly helpless" or "essentially non-conscious.") (citations omitted).

In evaluating a claim for ERISA benefits, "[t]he subjective element of pain is an important factor to be considered in determining disability." *Connors*, 272 F.3d at 136 (internal quotation marks omitted). Indeed, the Second Circuit has held that "[m]edically acceptable clinical and laboratory diagnostic techniques include consideration of [a] patient's report of complaints, or history [a]s an essential diagnostic tool." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citations omitted) (alteration in original). For this reason, a determination that a claimant's complaints of pain lack credibility must have an evidentiary basis in the record. *See Krizek*, 345 F.3d at 100 ("The District Court's decision not to credit [claimant's] pain complaints . . . is a factual inference . . . which requires at a minimum some evidentiary basis in the record to support the inference."); *Green v. Hartford Life & Accident Ins. Co.*, 2010 WL 3907823, at \*6 (N.D.N.Y. Sept. 30, 2010) (citation omitted) (observing that "when conducting a *de novo* review, the court is not required to accept subjective complaints of pain as credible; however, it is error to discount them merely because they are 'subjective.' . . . A court may not dismiss subjective complaints of pain as legally insufficient.").

In this case, because the AR contains ample objective medical evidence documenting Mr. Galuszka's complex regional pain syndrome, because Mr. Galuszka's treatment providers have uniformly accepted his complaints of pain as credible, and because the AR is bereft of evidence that Mr. Galuszka has fabricated or exaggerated his pain, the court deems Mr. Galuszka's persistent complaints of severe pain credible and persuasive. *See Quigley v. UNUM Life Ins. Co. of Am.*, 340 F. Supp. 2d 215, 224 (D.

Conn. 2004) ("Where the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints.").

### 4. Credibility of Dr. Manchester's Opinions.

In seeking a determination that he is "totally disabled" as required by the Policy, Mr. Galuszka relies on Dr. Manchester's opinions regarding his physical and mental restrictions. Reliance asks the court to find those opinions not credible because they are based on an inadequate treatment record, reflect limitations that are based solely on Mr. Galuszka's subjective complaints, and are inconsistent with other evidence in the record.

Although the opinions of a treating physician like Dr. Manchester are not entitled to special deference in the context of an ERISA claim, the court may not reject those opinions arbitrarily. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (rejecting a deferential treating physician rule but noting that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *Paese*, 449 F.3d at 442 ("[W]hile *Black & Decker* holds that no special deference is required, this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative.").

In assessing Dr. Manchester's credibility, the court evaluates his opinions "in the context of any factors it consider[s] relevant, such as the length and nature of [his treating] relationship, the level of . . . expertise, and the compatibility of the opinion with the other evidence." *Connors*, 272 F.3d at 135; *see also id.* at 135-36 (noting that the claimant's "regular physician" was more familiar with the claimant than other physicians who treated the claimant less frequently and that "it seems anomalous to give less weight to the [claimant's regular physician] than to the views of professionals hired by plaintiff's adversary, an insurance company").

Dr. Manchester treated Mr. Galuszka over a lengthy period of time and was familiar with his treatment by other health care providers. Although he is not a specialist

and treated Mr. Galuszka less frequently than Dr. Serafini, Dr. Manchester documented objective indicia of complex regional pain syndrome such as changes in Mr. Galuszka's mobility, flexibility, skin temperature, muscle spasticity, swelling, general appearance, and affect. His claims and findings were corroborated by the clinical findings of several pain specialists, including Dr. Serafini. Allsup urged ALJ Sutker to fully credit Dr. Manchester's opinions as part of Mr. Galuszka's SSDI application:

> Dr. Manchester's medical opinion is entitled to controlling weight per Social Security Ruling 96-2p. He has an established treating relationship with the claimant as his primary care physician and he is familiar with his medical conditions and history. Thus, he is able to provide insight into the severity of his impairments and how they affect his ability to function. His opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.

(Doc. 20-3 at 4.)

ALJ Sutker gave Dr. Manchester's opinions "significant weight" but found some of the limitations he imposed overstated. The court agrees with this assessment. While Dr. Manchester cited objective evidence that would render it physically and mentally difficult for Mr. Galuszka to perform a wide range of work-related activities, he cited no clinical findings that support his anxiety disorder and panic disorder diagnoses.[18]

In contrast, Dr. Manchester's diagnosis of depression is well supported by his clinical findings, as well as by the treatment notes of other health care providers such as Dr. Jones and Dr. Serafini who both diagnosed Mr. Galuszka with depression. Even Dr. Lewis recognized that Mr. Galuszka's diagnosis of depression was supported by sufficient evidence in the medical record. Moreover, the court need not find that Mr. Galuszka suffers from clinical depression in order to agree with ALJ Sutker that Mr. Galuszka's consistent and pervasive pain could reasonably impair his ability to sustain

---

[18] Under the Policy, benefits are payable only if a claimant is "under the regular care of a Physician," which means a "duly licensed practitioner who is recognized by the law of the state in which treatment is received as qualified to treat the type of Injury or Sickness for which [the] claim is made." (AR 18, 9.) Mr. Galuszka does not appear to have been under the regular care of a physician for his anxiety and panic disorders.

pace, focus, and concentration during an average work day. *See Wilson*, 2016 WL 5661973, at *5 (noting that the DSM-IV recognizes chronic pain syndrome as a mental disorder and concluding that ALJ erroneously rejected medical opinion that chronic pain "would constantly interfere with [claimant's] ability to maintain attention and concentration.").

While Reliance is correct that Dr. Manchester addressed the sedative impact of Mr. Galuszka's medications on his ability to work in only a conclusory manner, it is nonetheless undisputed that throughout the alleged period of disability, Mr. Galuszka was prescribed numerous medications which have documented sedative effects (Valium, Elavil, Lorcet, Hydrocodone). *See* Doc. 33 at 12, 15 (citing www.webmd.com for a description of the common side effects of these drugs which include "drowsiness"). The heavy weight Reliance asks the court to accord Dr. Serafini's repeated opinion that Mr. Galuszka was tolerating his pain medication without unacceptable side effects is thus misplaced. Dr. Serafini only noted that Mr. Galuszka believed that his pain medication allowed him to function as best as possible and with acceptable side effects. He did not opine the medications were free from sedative side effects or that they would have no impact on Mr. Galuszka's ability to work.

Reliance's further contention that Dr. Manchester's opinions are contradicted by Dr. Serafini's opinions is without merit. Dr. Manchester opined that Mr. Galuszka's physical and mental restrictions would prevent him from working at any exertional level on a full-time basis. Dr. Serafini never offered a contrary opinion. Indeed, he was never apparently asked if Mr. Galuszka could return to work. While Reliance correctly points out that Dr. Serafini observed in October 2013 that Mr. Galuszka's condition had improved, within months he recorded that Mr. Galuszka's "chronic pain has negatively impacted level of function, resulting in a lower general activity level, a depressed mood, more difficulty walking, less social interaction, more difficulty performing normal work, less enjoyment of life, poor sleep and difficulty performing the basic activities of daily living" (AR 895) and that Mr. Galuszka experienced "[m]arked interruption of activities of daily living," "[s]pasticity," "[c]omplex medical management," "[g]ait disturbance,"

and "[s]leep disturbance." (AR 887.) Dr. Serafini thus "remain[ed] concerned about his overall condition, his lack of improvement, and the progression of symptoms both in range and severity." (AR 888.) Dr. Serafini's treatment notes are therefore consistent with Dr. Manchester's opinions which reached similar conclusions in greater detail.

Because Dr. Manchester's opinions are based on a lengthy treatment period, are supported by objective medical findings, and are consistent with other evidence in the record, the court finds Dr. Manchester's opinions credible and entitled to significant weight. *See Green*, 2010 WL 3907823, at *7 (finding that the plaintiff's "treating physicians' opinions are due significant weight and are very helpful given their experience with Plaintiff and their familiarity with the history of her symptoms" and that the court's "own review of the record reveals nothing that would cause the Court to doubt Plaintiff or her physicians"). The court therefore concludes that Mr. Galuszka's chronic and debilitating pain significantly impairs his ability to physically work full-time and to maintain pace, focus, and concentration.[19]

### 5.     Other Medical Opinions.

Mr. Galuszka asks the court to rely on Dr. Groening's February 22, 2013 opinion that his pain was disabling to the extent that it would prevent him from working full-time at even a sedentary position and that he had moderate to severe adverse impacts from his pain and medication on his attention and concentration. He contends that Dr. Groening's opinions, alone, are sufficient to find him "totally disabled" under the Policy. The problem with this contention is two-fold. First, Dr. Groening is a podiatrist and it is not clear that he is qualified to render an opinion regarding Mr. Galuszka's mental impairments. And second, Dr. Groening concedes that he last evaluated Mr. Galuszka in

---

[19] Reliance argues that *Ansari v. Metropolitan Life Insurance Co.*, 2014 WL 7046545 (D. Mass. Dec. 11, 2014) stands for the proposition that complex regional pain syndrome is not per se indicative of "total disability." In *Ansari*, the magistrate judge noted that "[n]ot only is there very little evidence supporting Plaintiff's diagnosis of CRPS" including a medical opinion that "Plaintiff had none of the hallmark signs of CRPS" but "more significantly, there is almost no objective evidence that Plaintiff could not work." *Id.* at *7. In contrast, in this case, Mr. Galuszka's complex regional pain syndrome diagnosis is undisputed, he has many of the "hallmark signs" of that disorder, and there is objective evidence as to its impact on his ability to work. *Ansari* is thus clearly inapposite.

July of 2012. Accordingly, at best, Dr. Groening's opinion merely confirms that moderate to severe interference with attention and concentration may occur with complex regional pain syndrome.

Reliance, in turn, asks the court to accord significant weight to Dr. Roberts's opinion that Mr. Galuszka had no issue with his gait or station, had a well-healed surgical site, that he was unwilling to definitively diagnose complex regional pain syndrome, and that he saw no point in additional intervention efforts. All this is true, however, it cherry picks from Dr. Roberts's reports. Dr. Roberts's statement that he saw no point in further efforts at intervention was not an opinion that further treatment was unnecessary. Rather, it was an acknowledgement that despite aggressive treatment, Mr. Galuszka's pain and related symptoms were not likely to improve.

For similar reasons, the court rejects Reliance's characterization of Dr. Jones's opinion as supportive of a conclusion that Mr. Galuszka remained active despite his pain. Dr. Jones made this observation once based on Mr. Galuszka's self-report in the midst of treatment notes that endorse a diagnosis of complex regional pain syndrome based upon specific clinical findings. Far from opining that Mr. Galuszka engaged in an active, unrestricted lifestyle, Dr. Jones noted that "[a]s a consequence of his illness, he has become increasingly immobile." (AR 436.)

On balance, the court finds the opinions of Drs. Groening, Roberts, and Jones credible, consistent with a complex regional pain syndrome diagnosis, and generally supportive of Mr. Galuszka's claim that he is "totally disabled" under the Policy.

### 6.    Dr. Lewis's Opinions.

Reliance asks the court to find that the "independent physician peer review" performed by Dr. Lewis supports a conclusion that Mr. Galuszka is not "totally disabled." (Doc. 23 at 28.) Mr. Galuszka responds that Dr. Lewis did not physically examine him, performed an inadequate review of his medical records, failed to adequately address Mr. Galuszka's mental capacity as a result of his pain, and never opined that Mr. Galuszka could perform Reliance's four alternative occupations. In addition, Mr. Galuszka argues

that Dr. Lewis is biased in Reliance's favor and points to courts that have rejected his opinions.

In material respects, Dr. Lewis's opinions reflect a significant degree of agreement with the opinions of Mr. Galuszka's treating physicians. He does not overtly criticize, reject, or disagree with any of those opinions, including those of Dr. Manchester. He concurs with Mr. Galuszka's primary diagnosis of complex regional pain syndrome and with secondary diagnosis of tinnitus, hypertension, and depression. He endorses medical documentation of Mr. Galuszka's antalgic gait, edema, light touch and thermal hypersensitivity, allodynia, increased patch hair distribution, alteration of skin temperature, decreased strength, swelling, and skin breakdown. He concludes that there is "medical data to substantiate the presence of [Mr. Galuszka's] complaints" and finds Mr. Galuszka's treatment plan "reasonable and appropriate for the claimant's ongoing symptomology and reported conditions." (AR 726.)

While concluding that Mr. Galuszka could work full-time, Dr. Lewis did not opine that Mr. Galuszka was capable of performing any of the alternative occupations identified in the RE Analysis. The Second Circuit has held that "a proper inquiry would require not only a medical assessment of [the claimant's] capacity to perform both physical and sedentary work, but also a non-medical assessment as to whether []he has the vocational capacity to perform any type of work." *Demirovic*, 467 F.3d at 214-15 (citations omitted). Although Reliance argues that the alternative occupations identified in the RE Analysis are "consistent with the functional limitations recommended by Dr. Lewis" (Doc. 23 at 29), Dr. Lewis did not address whether Mr. Galuszka's pain and associated symptoms interfered with his ability to concentrate or whether Mr. Galuszka could perform effectively under stress and work under specific instructions. While recognizing Mr. Galuszka's credible complaints of pain and his depression, Dr. Lewis imposed no mental capacity limitations on his ability to return to full-time work.

Dr. Lewis did not perform a physical or mental examination of Mr. Galuszka, even though the Policy authorizes Reliance to request both as frequently as it deems such examinations necessary. Reliance contends that it asked Dr. Lewis to opine only as to

Mr. Galuszka's physical limitations because "[a]n expert report was not required by Reliance [regarding Mr. Galuszka's mental limitations] because the claim of concentration and focus problems was unsupported." (Doc. 34 at 12 n.8.) The medical record belies this contention and casts doubt on the accuracy of Reliance's claims evaluation. As one court recently observed:

> [A] court may take into account whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records. Though the lack of an in-person examination is not determinative, it is a relevant consideration, especially with respect to conditions that are not susceptible to objective verification. [W]here the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits. This is of particular importance where the medical determination is psychiatric in nature. Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time.

*James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 883 (N.D. Cal. 2014) (citations and internal quotation marks omitted); *see also Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (holding that "the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so raise[s] questions about the thoroughness and accuracy of the benefits determinations.") (internal quotation marks omitted); *Rappa v. Conn. Gen. Life Ins. Co.*, 2007 WL 4373949, at *11 (E.D.N.Y. Dec. 11, 2007) (holding that a peer review which "was not based on any interaction with" the claimant, consisted of "specific questions by [the insurer] which were all answered in [the insurer's] favor" and which "fail[ed] to adequately and credibly rebut the findings of [the claimant's] treating physicians" did not constitute substantial evidence).

As Mr. Galuszka further points out, the Sixth Circuit has observed that "Dr. Lewis's conclusions have been questioned in numerous federal cases[.]" *Shaw*, 795 F.3d at 549, 551 (noting that Dr. Lewis's "track record further supports the conclusion that the Plan did not engage in a deliberate, principled reasoning process in this case" and

concluding that Dr. Lewis "engaged in a selective review of the record") (internal quotation marks omitted); *see also Holzmeyer v. Walgreen Income Prot. Plan for Pharmacists & Registered Nurses*, 44 F. Supp. 3d 821, 837 (S.D. Ind. 2014) (finding that the "record review opinions of Drs. Parisien and Lewis—upon which Sedgwick's letter of termination principally relied—either ignored or misconstrued the functional capacity evaluations proffered by Holzmeyer's treating physicians"); *James*, 41 F. Supp. 3d at 875 ("While Dr. Lewis more directly addressed James's medical history . . . he ignored the opinion of James's pain specialist that James's chronic pain prevented her from working and reached arbitrary and capricious conclusions" and "[m]ore troubling" he appeared "to have simply misstated or failed to consider crucial evidence in the record."). Reliance, in turn, points to a number of cases in which defense judgments were entered or recommended on summary judgment based at least in part on Dr. Lewis's opinions. *See* Doc. 32 at 20-21 (citing cases).

While it is true "that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements," *Nord*, 538 U.S. at 832 (internal quotation marks omitted), it is equally true that "a treating physician, in a close case, may favor a finding of 'disabled.'" *Id.* Here, the court finds no evidence that either Mr. Galuszka's treating physicians or Dr. Lewis was motivated by improper bias. Accordingly, without reaching any adverse opinions regarding Dr. Lewis's professionalism, the court nonetheless rejects his opinions as unsupported his own descriptions of Mr. Galuszka's condition and his conclusion that "[t]he prognosis for [his] returning to work without restrictions or impact is poor." (AR 726.) Dr. Lewis's opinions are also inconsistent with the record evidence as a whole and the clinical findings and opinions of Mr. Galuszka's treating physicians.

### 7.    Whether Mr. Galuszka can Perform the Alternative Occupations Identified in the RE Analysis.

Under the Policy, Mr. Galuszka bears the burden of establishing that he cannot perform "any occupation" for which his education, training, or experience will

reasonably allow." (AR 10.) Citing the opinions of his treating physicians and the SSDI Decision, Mr. Galuszka asserts that he has satisfied that burden. In response, Reliance effectively concedes that, according to Dr. Lewis, Mr. Galuszka cannot work as a Holter scanning technician, a clinic clerk, or blood bank order control clerk because he cannot perform the frequent reaching required by those occupations. *See* AR 1488, 1490, 1492. The only remaining occupation identified by Reliance is a telemetry technician.

A telemetry technician "monitors heart rhythm pattern of patients in special care unit of hospital to detect abnormal pattern variances, using telemetry equipment." (AR 1485.) Tasks include "[r]eview[ing] patient information to determine normal heart rhythm pattern, current pattern, and prior variances," and "[o]bserv[in]g cardiac monitors and listen[ing] for alarm to identify abnormal variation in heart rhythm" as well as "[m]easuring length and height of patient's heart rhythm on graphic tape readout, using calipers, and post[ing] information on patient records" and "[a]nswering calls for assistance from patients and inquiries concerning patients from medical staff[.]" *Id.* A telemetry technician's "[w]ork situations" require "performing effectively under stress," "[w]orking under specific instructions," and "[m]aking judgment and decisions." (AR 1486.)

It is not clear whether Mr. Galuszka is qualified to work as a telemetry technician as it appears that NMC respiratory therapists operate different machinery and equipment from telemetry technicians. *Compare* AR 675, *with* AR 1485-86. A telemetry technician has a specific vocational preparation of six months to a year before an individual can be expected to perform the duties of that position. The Policy requires an "other occupation" to be one that Mr. Galuszka's training, experience, and education reasonably allow him to perform. The court need not resolve this issue because, with or without vocational preparation, Mr. Galuszka cannot perform the essential duties of a telemetry technician on a full-time basis. His need for frequent breaks to elevate his leg and change his position, his frequent time off task, and his inability to maintain pace, concentration, and focus as a result of his debilitating pain, will render it impossible for him to perform

47

that position on a full-time basis.  The court therefore finds Mr. Galuszka is "totally disabled" within the meaning of the Policy and the Life Insurance Policies.[20]

For the foregoing reasons, Mr. Galuszka's motion for judgment on the Administrative Record (Doc. 24) is GRANTED and Reliance's motion for judgment on the Administrative Record (Doc. 22) is DENIED.

## V.    Interest and Attorney's Fees.

Mr. Galuszka requests an award of retroactive benefits under the Policy with prejudgment interest and attorney's fees and costs.  His submissions, however, do not address the benefit calculation, the appropriate interest rate, or the issue of attorney's fees.

The court has discretion to award attorney's fees and costs, as well as prejudgment interest in actions arising under ERISA.  *See Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 53-54 (2d Cir. 2009) ("We have interpreted ERISA as authorizing the district court to award prejudgment interest to a successful ERISA claimant, and that decision, like the decision to award attorney's fees, is committed to the sound discretion of the district court.").  The court will therefore entertain an adequately supported application from Mr. Galuszka, to which Reliance will have the opportunity to object.

## VI.    Reliance's Counterclaim.

The parties have not briefed whether the court should enter judgment with regard to Reliance's counterclaim for equitable restitution in the amount of $40,168.02 pursuant to § 502(a)(3) of ERISA.  *See* 29 U.S.C. § 1132(a)(3) ("A civil action may be brought . . . by a . . . fiduciary . . . to obtain other appropriate equitable relief (i) to redress [] violations [of the terms of the plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]").  Reliance alleges it has a "lien by agreement to the funds

---

[20] The definition of "total disability" in the Life Insurance Policies is not materially different. *Compare* AR 349 (providing that "total disability" under the Life Insurance Policies means that the claimant "is unable to perform the material duties of any gainful occupation for which he/she is suited by education, training or experience"), *with* AR 348 (providing that "total disability" under the Policy means that, after payment for twenty-four months, the claimant "cannot perform the material duties of any occupation . . . that the [claimant's] education, training or experience will reasonably allow").

received by Mr. Galuszka in connection with his receipt of Social Security benefits." (Doc. 6 at 4, ¶ 5.) At oral argument, Mr. Galuszka's counsel conceded that Mr. Galuszka owes Reliance $40,168.02 in overpaid benefits under the Policy and that Mr. Galuszka has not repaid that amount.

To obtain "appropriate equitable relief" pursuant to § 502(a)(3) of ERISA, a claimant "generally must seek . . . to restore to the plaintiff particular funds or property in the defendant's possession" rather than seek to impose "personal liability for the benefits" it conferred. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002). Where a participant in an ERISA plan "dissipates the whole settlement [it received from a third party] on nontraceable items, the fiduciary cannot bring a suit to attach the participant's general assets under § 502(a)(3) because the suit is not one for 'appropriate equitable relief.'" *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 655 (2016).

Because the AR does not reveal whether the funds Mr. Galuszka owes Reliance have been dissipated, or, if dissipated, have been spent on nontraceable items, judgment on Reliance's counterclaim is not appropriate at this time. The court therefore DEFERS adjudication of Reliance's counterclaim.

## CONCLUSION

For the foregoing reasons, the court GRANTS Mr. Galuszka's motion to supplement the administrative record to include Documents 20-3 and 20-4 (Doc. 20), GRANTS Mr. Galuszka's motion for judgment on the administrative record (Doc. 24), and DENIES Reliance's motion for judgment on the administrative record (Doc. 22). The court DEFERS adjudication of Reliance's counterclaim and Mr. Galuszka's request for attorney's fees and interest.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 9th day of January, 2017.

Christina Reiss, Chief Judge
United States District Court